**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

IN RE: TIME WARNER INC. SET-TOP CABLE          MDL No. 1995 (PKC)
TELEVISION BOX ANTITRUST LITIGATION

                                                Lead Case:
                                                08 Civ. 7616 (PKC)

_____

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS PLAINTIFFS'**
**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**LATHAM & WATKINS LLP**
Margaret M. Zwisler (*pro hac vice*)
Matthew A. Brill (*pro hac vice*)
Jennifer L. Giordano (JH-5052)
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004
Tel: 202-637-2200
Fax: 202-637-2201
margaret.zwisler@lw.com
jennifer.giordano@lw.com

**Counsel for Defendant Time Warner Cable Inc.**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................. 1

FACTUAL AND REGULATORY BACKGROUND ........................................ 2

SUMMARY OF ARGUMENT .......................................................................... 6

ARGUMENT ................................................................................................... 8

I.     PLAINTIFFS' CLAIMS FOR TYING UNDER THE SHERMAN ACT AND THE STATE ANTITRUST LAWS OF MAINE, NEW YORK, NORTH CAROLINA AND WEST VIRGINIA FAIL AS A MATTER OF LAW ......................... 8

     A.     Plaintiffs' Allegations In Support Of Their Proposed Product And Geographic Markets Are Incoherent And Contradictory ......................... 9

          1.     Plaintiffs Have Not Alleged A Relevant Market For "Premium Cable Services" ................................................................. 9

          2.     Plaintiffs' Allegation Of A Uniform Geographic Market Conflicts With Their Other Allegations That Competition Is Localized ................. 11

     B.     Plaintiffs' Factual Allegations Contradict Their Legal Assertion That TWC Possesses Economic Power In A Relevant Market ..................... 12

          1.     Plaintiffs' Own Allegations Contradict Their Claim That TWC's Economic Power Over Cable Services "Naturally" Gives It Economic Power Over Premium Cable Services ....................... 13

          2.     Plaintiffs' Factual Allegations Are Irrelevant And Insufficient To Establish Their Claim That TWC Has Economic Power In A Market For Cable Services ....................................................... 14

     C.     Plaintiffs' Own Allegations Confirm That TWC Did Not Coerce Them To Rent Set-Top Boxes As A Matter Of Law ............................................. 17

          1.     Plaintiffs Admit That TWC Provided CableCARDs As An Alternative To Renting Set-Top Boxes ....................................... 17

          2.     TWC's Alleged Promotion Of Set-Top Boxes Over CableCARDs Cannot Establish Coercion As A Matter Of Law ...................... 19

         3.      Plaintiffs' Allegations Regarding TWC's Purported Violations Of FCC Regulations Do Not Establish Coercion..............................................20

    D.      Plaintiffs' Allegations Confirm That There Were No Anticompetitive Effects In The Market For Set-Top Boxes At The Operative Time .....................21

II.    Plaintiffs Cannot State A Claim Under State Consumer Protection Statutes As A Matter Of Law..................................................................................................................23

    A.      Plaintiffs' Claims Under The Consumer Protection Laws of California, Kansas, Missouri And New Jersey Fail Because They Are Based Solely On Legitimate Business Conduct That Does Not Violate The Antitrust Laws..............................................................................................................23

    B.      Plaintiffs' Claims Under The Consumer Protection Statutes Of New Jersey And Kansas Also Fail Because Plaintiffs Do Not Allege Unconscionable Or Deceptive Practices.............................................................................................23

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bansavich v. McLane Co.*,
  2008 U.S. Dist. LEXIS 89071 (D. Conn. Oct. 31, 2008) ....................................................... 8, 9

*Barr Labs., Inc. v. Abbott Labs.*,
  978 F.2d 98 (3d Cir. 1992) ...................................................................................................... 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................. 8, 17

*Cancall PCS, LLC v. Omnipoint Corp.*,
  2001 WL 293981 (S.D.N.Y. 2001) ..................................................................................... 21, 22

*CCBN.com, Inc. v. Thomson Fin. Inc.*,
  270 F. Supp. 2d 146 (D. Mass. 2003) ...................................................................... 13, 14, 15, 16

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ...................................................................................................... 3

*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001) .................................................................................................... 23

*Coniglio v. Highwood Servs., Inc.*,
  495 F.2d 1286 (2d Cir. 1974) .................................................................................................. 22

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) ........................................................................................................ 3

*Cox v. Nat'l R.R. Passenger Corp.*,
  2009 WL 382657 (S.D.N.Y. Feb. 17, 2009) ............................................................................. 8

*Cox v. Sears Roebuck & Co.*,
  647 A.2d 454 (N.J. 1994) ........................................................................................................ 24

*Davric Me. Corp. v. Rancourt*,
  216 F.3d 143 (1st Cir. 2000) .................................................................................................... 9

*Dickson v. Microsoft*,
  309 F.3d 193 (4th Cir. 2002) ............................................................................................. 15, 16

*E&L Consulting Ltd. v. Doman Indus.*
  360 F. Supp. 2d 465 (E.D.N.Y. 2005) ................................................................................. 10, 11

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006) ...................................................................... 8, 9, 10, 21

*Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*,
    243 F.3d 980 (6th Cir. 2001) .................................................................... 16

*Gen. Motors Corp. v. Gibson Chem. & Oil Co.*,
    786 F.2d 105 (2d Cir. 1986) ..................................................................... 20

*Ill. Tool Works, Inc. v. Independent Ink, Inc.*,
    547 U.S. 28 (2006) ................................................................................... 12

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................................... 24

*Int'l Design Concepts, LLC v. Saks Inc.*,
    486 F. Supp. 2d 229 (S.D.N.Y. 2007) ...................................................... 3

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1982) ..................................................................................... 13

*Konik v. Champlain Valley Physicians Hosp. Med. Ctr.*,
    733 F.2 1007 (2d Cir. 1984) ..................................................................... 17, 18

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    2007 U.S. Dist. LEXIS 61373 (N.D. Cal. Aug. 4, 2007) .......................... 23

*Kramer v. The Pollock-Krasner Found.*,
    890 F. Supp. 250 (S.D.N.Y. 1995) ........................................................... 11

*Mathias v. Daily News, L.P.*,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001) ...................................................... 9, 11, 12

*MRO Commc'ns., Inc. v. AT&T Co.*,
    1999 U.S. App. LEXIS 32522 (9th Cir. Dec. 13, 1999) ........................... 16

*N. Pac. Ry. v. United States*,
    356 U.S. 1 (1958) ..................................................................................... 17

*New York v. Rattenni*,
    613 N.E.2d 155 (N.Y. 1993) ..................................................................... 9

*Re-Alco Indus., Inc. v. Nat'l Ctr. For Health Educ., Inc.*,
    812 F. Supp. 387 (S.D.N.Y. 1993) ........................................................... 9

*Rick-Mik Enters., Inc., v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) .................................................................... 13

*Rose v. Vulcan Materials Co.*,
    194 S.E.2d 521 (N.C. 1973) ........................................................................... 9

*Sheridan v. Marathon Petroleum Co.*,
    530 F.3d 590 (7th Cir. 2008) ................................................ 13, 14, 15, 16

*Synergetics USA, Inc. v. Alcon Labs., Inc.*,
    2009 WL 435299 (S.D.N.Y. Feb. 23, 2009) .......................................... 17

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) ........................................................................ 16

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
    964 F.2d 186 (2d Cir. 1992) ............................................................... 19, 20

*Unijax v. Champion Int'l, Inc.*,
    683 F.2d 678 (2d Cir. 1982) ............................................................... 17, 19

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .................................................................................... 13

*Verizon Commc'ns, Inc. v. Trinko*
    540 U.S. 398 (2004) ............................................................................. 20, 21

## STATUTES AND RULES

47 U.S.C. § 543(b)(3) ...................................................................................... 2

47 U.S.C. § 543(b)(7)(a) ................................................................................. 2

47 U.S.C. § 549(a) .......................................................................................... 4

Fed. R. Civ. P. 11(b)(3) ................................................................................. 18

Fed. R. Civ. P. 12(b)(6) ................................................................................... 1

Kan. Stat. Ann. § 50-627 ........................................................................ 23, 24

Kan. Stat. Ann. § 50-626(a) ......................................................................... 23

N.J. Stat. Ann. § 56:8-2 ................................................................................ 23

W. Va. Code § 47-18-16 .................................................................................. 9

## REGULATORY AUTHORITY

47 C.F.R. § 76.1204(a) ............................................................................... 5, 19

47 C.F.R. § 76.920 .......................................................................................... 2

47 C.F.R. § 76.923(a)(2) ........................................................................................ 2, 24

*Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Eleventh Annual Report, 20 FCC Rcd 2755 (2005) ................................................ 5

*Annual Assessment of the Status of Competition in the Mkt. for the Delivery of Video Programming*, Thirteenth Annual Report, 24 FCC Rcd 542 (2009) ..................................... 5, 19

*Annual Assessment of the Status of Competition in the Mkt. for the Delivery of Video Programming*, Twelfth Annual Report, 21 FCC Rcd 2503 (2006) ............................................. 5

*Implementation of Section 304 of the Telecommunications Act of 1996; Commercial Availability of Navigation Devices*, Report and Order, 13 FCC Rcd 14775 (1998) ........................... 3, 4, 19

*Implementation of Section 304 of the Telecommunications Act of 1996; Commercial Availability of Navigation Devices*, Second Report and Order and Second Further Notice of Proposed Rulemaking, 18 FCC Rcd 20885 (2003) ............................................................ 4, 19

## INTRODUCTION

Defendant Time Warner Cable Inc. ("TWC") respectfully submits this memorandum in support of its motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' First Amended Consolidated Class Action Complaint ("Compl.") with prejudice.

Plaintiffs allege that TWC violated the Sherman Act and state law by engaging in an illegal "tying" arrangement: forcing them to rent set-top boxes from TWC in order to receive what plaintiffs call "Premium Cable Services."  (Compl. ¶ 3.)  However, the allegations in plaintiffs' own complaint contradict the facts that plaintiffs must allege to state an antitrust tying claim.

*First*, plaintiffs must allege that TWC forced them to rent a set-top box to obtain Premium Cable Services.  But plaintiffs admit that TWC actually provided an alternative to renting a set-top box, and therefore TWC cannot have coerced them as a matter of law, even if TWC promoted its set-top boxes over these alternative devices.  *Second*, plaintiffs must allege that some willing and able seller of set-top boxes was foreclosed from the market by the alleged tie.  However, plaintiffs' own allegations show that no manufacturer wanted to sell set-top boxes at the operative time.  *Finally*, plaintiffs must allege that TWC has sufficient market power in a relevant product and geographic market to force plaintiffs to rent a set-top box or forego access to the relevant product.  Plaintiffs allege that the tying product is Premium Cable Services, but then define the product market as cable services without alleging any facts to explain the interaction between the two.  Plaintiffs further allege that TWC has economic power in the local communities in which it does business, but they have not offered any facts to explain why the market must be limited to these communities.  Moreover, their own allegations contradict their suggestion that TWC's purported market power is uniform in each of these communities.

1

Plaintiffs' own allegations therefore confirm that they are fundamentally unable to state an antitrust claim.

The current complaint is plaintiffs' third attempt to state a viable antitrust claim. Before filing this most recent complaint, plaintiffs had the benefit of knowing, in detail, the basis on which TWC intended to move to dismiss their claims. Despite this fair warning, all of plaintiffs' claims still fail as a matter of law. Plaintiffs should not get a fourth bite at the apple. The Court should dismiss their complaint in its entirety, with prejudice.

## FACTUAL AND REGULATORY BACKGROUND

TWC provides cable television services, among other services, to customers in a diverse array of geographic markets around the country. (Compl. ¶ 21.) Because TWC is a cable operator, the FCC regulates virtually every aspect of its business, including the rates that it can charge for set-top boxes, *see, e.g.*, 47 U.S.C. § 543(b)(3); 47 C.F.R. § 76.923(a)(2) (prescribing that equipment rates "shall not exceed charges based on actual costs"), as well as the types and tiers of programming it offers, *see* 47 U.S.C. § 543(b)(7)(a); 47 C.F.R. § 76.920.

TWC offers its cable programming to consumers based upon tiers of service. (Compl. ¶ 41.) Plaintiffs describe the least expensive level of service as "basic cable," which provides a limited number of channels for a monthly fee. (*Id.*) Customers can obtain basic cable services through a set-top box or through a "cable ready" television set. (*Id.* ¶ 41.) For an additional monthly fee, customers can receive premium channels, such as HBO and Showtime, and other specialty channels and video programming services. (*Id.* ¶ 42.) Plaintiffs describe these optional subscription services as "Premium Cable Services." (*Id.* ¶ 44.)

Consumers cannot obtain these optional services simply by plugging in a cable-ready television set. Instead, they must obtain a set-top box or equivalent device that receives video

signals, navigates among the available channels (*id.* ¶ 47) and performs a security or "conditional access" function. *Implementation of Section 304 of the Telecommunications Act of 1996; Commercial Availability of Navigation Devices*, Report and Order, 13 FCC Rcd 14775, 14792 ¶ 47 (1998) ("*Navigation Devices Order*") (These devices control "access to services so that only those who are authorized to receive service — who have paid for the service — can access it").[1] Customers can obtain a set-top box by leasing the device from TWC. (Compl. ¶ 47.) TWC does not make the set-top boxes, but instead purchases them from three suppliers, Scientific Atlanta, Motorola, and Samsung. (*Id.* ¶¶ 4, 50.)

For many years, consumers could obtain set-top boxes only from cable operators such as TWC; the set-top box manufacturers did not sell them at retail for a variety of technological, regulatory, and marketplace reasons. The fact that set-top boxes must be compatible with the specific technology installed in the local cable "head-end" made it challenging for manufacturers to sell set-top boxes at retail, particularly because each model would work only in selected areas and a device might be rendered useless each time a consumer moved. *See Navigation Devices Order*, 13 FCC Rcd at 14793-94 ¶ 49 (describing efforts to "enhance portability of equipment").

In 1996, Congress enacted Section 629 of the Communications Act, as amended, which directed the FCC to adopt regulations to promote the nationwide availability of set-top boxes and other navigation devices (such as television sets with integrated navigation functions) for

---

[1]     The FCC record on the development and implementation of CableCARDs is an integral part of plaintiffs' complaint. (*See, e.g.,* Compl. ¶¶ 53-67.) Accordingly, the Court may take judicial notice of the FCC public record on CableCARDs cited throughout this brief. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (taking judicial notice of documents integral to plaintiff's complaint and upon which they relied in bringing suit); *Cf. Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 236 (S.D.N.Y. 2007) (Castel, J.) ("'Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'" (quoting *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002))).

purchase at retail.  47 U.S.C. § 549(a).  To comply with Section 629, the FCC issued a series of orders to promote the commercial availability of set-top boxes and other navigation devices.  The FCC determined that the core challenge in implementing Section 629 was "to determine how to achieve commercial availability without at the same time compromising the security protection priority provided for in the law."  *Navigation Devices Order*, 13 FCC Rcd at 14793 ¶ 48.  The FCC determined that the best way to do that was to separate the navigation and security functions of set-top boxes and other navigation devices and eventually to bar cable operators from leasing integrated devices.  *Id.* at 14793 ¶ 49.  In particular, the FCC observed that emerging technical standards would allow cable operators "to place all security-related circuitry on a module or a security card that can be inserted into...competitively supplied navigation devices."  *Id.* at 14805 ¶ 74.  That security module was called a "point of deployment module" or "POD," and later came to be known as a CableCARD.  (Compl. ¶¶ 54-55.)  The FCC's hope was that consumer electronic manufacturers would be willing to invest in the development of set-top boxes and other navigation devices for sale at retail, if they knew that consumers could use the retail devices to obtain programming from the cable provider of their choice simply by acquiring a CableCARD from that provider.  *See Navigation Devices Order*, 13 FCC Rcd at 14799 ¶ 61.

The FCC adopted rules requiring cable operators "to maintain an adequate supply of PODs [*i.e.*, CableCARDs] and ensure convenient access to such PODs for their subscribers by July 1, 2004."  *See Implementation of Section 304 of the Telecommunications Act of 1996; Commercial Availability of Navigation Devices*, Second Report and Order and Second Further Notice of Proposed Rulemaking, 18 FCC Rcd 20885, 20895 ¶ 19 (2003) ("*Plug and Play Order*").  Although cable providers were obligated to (and did) make CableCARDs available to their customers beginning in July 2004 for use in retail devices such as TiVo boxes, cable

providers were also permitted to continue providing integrated set-top boxes until July 1, 2007. *See* 47 C.F.R. § 76.1204(a). "As of August 2004, the top 10 cable operators [including TWC] had deployed CableCARDs to…approximately 5,000 subscribers nationwide." *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Eleventh Annual Report, 20 FCC Rcd 2755, 2852 ¶ 187 (2005) ("FCC Eleventh Annual Rpt.").[2]

With respect to TWC in particular, the required FCC regulatory filings state that it served 13,074 customers with CableCARDs as of 2005; 38,492 customers with CableCARDs as of 2006; 44,015 customers with CableCARDs as of 2007; and 43,513 customers with CableCARDs (using 59,962 total CableCARDs) as of 2008.[3]

---

[2]  By November 30, 2005, 375 certified or verified models of CableCARD products from 22 manufacturers were commercially available to consumers, and the ten largest cable operators (including TWC) had deployed 90,000 CableCARDs. *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Twelfth Annual Report, 21 FCC Rcd 2503, 2510 ¶ 24, 2527-28 ¶ 54 (2006). The FCC report on which plaintiffs rely indicates that, by March 2007, the number of certified or verified CableCARD products had climbed to 548, and more than 259,000 CableCARDs had been deployed. *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Thirteenth Annual Report, 24 FCC Rcd 542, 666 ¶ 264 (2009).

[3]  *See* 2005 FCC CableCARD Status Report, transmitted by Letter of Neal M. Goldberg, General Counsel, NCTA, to Marlene H. Dortch, Secretary, Federal Communications Commission, at 28 (Dec. 29, 2005), *available at* http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi? native_or_pdf=pdf&id_document=6518191777; 2006 FCC CableCARD Status Report, transmitted by Letter of Neal M. Goldberg, General Counsel, NCTA, to Marlene H. Dortch, Secretary, Federal Communications Commission, at 16 (Sept. 25, 2006), *available at* http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518510051; 2007 FCC CableCARD Status Report, transmitted by Letter of Neal M. Goldberg, General Counsel, NCTA, to Marlene H. Dortch, Secretary, Federal Communications Commission, at 14 (Sept. 24, 2007), *available at* http://fjallfoss.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf= pdf&id_document=6519734668; 2008 FCC CableCARD Status Report, transmitted by Letter of Neal M. Goldberg, General Counsel, NCTA, to Marlene H. Dortch, Secretary, Federal Communications Commission, at 13 (Sept. 22, 2008), *available at* http://fjallfoss.fcc.gov/ prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6520170031.

## SUMMARY OF ARGUMENT

The Court should dismiss plaintiffs' complaint because their own allegations establish that they cannot state an antitrust claim as a matter of law.  *First*, plaintiffs are required to identify a plausible relevant product and geographic market from which the Court can assess TWC's purported market power for the "tying product," which plaintiffs define as "Premium Cable Services."  But plaintiffs make inconsistent and contradictory claims about the purported market for Premium Cable Services, simultaneously arguing that satellite services are excluded while relying on statistics reflecting their inclusion.  Plaintiffs also allege that TWC's market power is uniform in the communities where it conducts business, but their own allegations demonstrate that TWC faces different types and levels of competition in each of the different local markets in which it competes.

*Second,* plaintiffs must allege that TWC possesses economic power in a relevant product market.  Although plaintiffs conclusorily allege that TWC's purported economic power in a market for *cable services* "naturally gives [TWC] control over Premium Cable Services," (Compl. ¶ 70), they essentially admit that there is no direct correlation between the purchase of basic cable services and the purchase of Premium Cable Services.  Plaintiffs allege that TWC's basic cable subscribers need to pay an additional monthly fee to obtain Premium Cable Services and that little more than half of them chose to do so.

Even if it were possible to infer that TWC possesses economic power in an alleged market for Premium Cable Services simply because it purportedly has economic power in a market for cable services, plaintiffs' own allegations directly conflict with their assertion that TWC has economic power in a putative cable services market.  Plaintiffs admit that fiber optic providers, including telephone industry giants Verizon (FiOS) and AT&T (U-Verse), are in the

relevant market and are a "viable threat" to cable companies, including TWC.  (*Id*. ¶ 78.) Plaintiffs' other allegations are only aggregated, national statistics about the penetration of all cable providers generally; they say nothing about TWC in particular, either nationally or within each of the local geographic markets in which TWC competes.

*Third,* plaintiffs must allege that TWC "coerced" them into renting set-top boxes and that they had no other alternative to obtain Premium Cable Services.  But plaintiffs admit that TWC provides an alternative to renting set-top boxes.  CableCARDs allow customers to obtain Premium Cable Services without renting a set-top box.  The FCC has required TWC and other cable providers to offer CableCARDs to their subscribers since July 2004, and TWC has complied with that directive.  Plaintiffs' allegation that TWC promotes its set-top boxes over CableCARDs is not sufficient to establish coercion as a matter of law.  Moreover, even if plaintiffs were correct that TWC has violated or not timely complied with the FCC's CableCARD regulations, the violation of a regulatory duty does not create antitrust liability.

*Fourth*, plaintiffs must allege that some "willing and able seller" of set-top boxes was foreclosed from the set-top box market by the alleged tie.  However, plaintiffs admit that consumer electronics manufacturers were not "willing to commit their resources" to developing set-top boxes or other navigation devices prior to the FCC's CableCARD regulations.  (Compl. ¶ 88.)  Thus, they admit that no willing and able seller was foreclosed from the market prior to the time that the FCC ordered the cable providers to develop and implement the CableCARD technology.  Before the FCC adopted the CableCARD regulatory scheme, neither TWC nor any other cable provider had a duty to create or promote a retail market in which third parties could sell navigation devices.  And, after that time, TWC merely had an obligation to comply with the FCC's regulations.

*Fifth*, plaintiffs' state law consumer protection claims fail because they are based on the exact same allegations underlying their antitrust claims.  Because TWC's activities constitute legitimate business conduct that does not violate the antitrust laws, they necessarily are not unfair to consumers.

## ARGUMENT

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court held that plaintiffs are required to plead factual allegations sufficient "to state a claim to relief that is plausible on its face."  In this Circuit, the pleading standard announced in *Twombly* applies to all claims, not just to allegations of conspiracy under Section 1 of the Sherman Act.  *See, e.g.*, *Cox v. Nat'l R.R. Passenger Corp.*, 2009 WL 382657, at *2 (S.D.N.Y. Feb. 17, 2009) (Castel, J.) (applying *Twombly* and dismissing claim under 42 U.S.C. § 1983); *see also Bansavich v. McLane Co.*, 2008 U.S. Dist. LEXIS 89071, at *2 (D. Conn. Oct. 31, 2008) (applying *Twombly* and dismissing plaintiff's antitrust tying claim).  Plaintiffs do not satisfy *Twombly*'s pleading requirements for either their federal or state law claims.

## I.   PLAINTIFFS' CLAIMS FOR TYING UNDER THE SHERMAN ACT AND THE STATE ANTITRUST LAWS OF MAINE, NEW YORK, NORTH CAROLINA AND WEST VIRGINIA FAIL AS A MATTER OF LAW

To state a valid claim of illegal tying, plaintiffs must allege five elements:  (1) a tying and a tied product; (2) evidence of actual coercion by the seller that forced the buyer to accept the tied product; (3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; (4) anticompetitive effects in the tied market; and (5) the involvement of a "not insubstantial" amount of interstate commerce in the tied market.  *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006).  Plaintiffs' complaint fails to allege sufficient facts with respect to at least four of these five elements: (1) a relevant market

in which to evaluate the tying product; (2) actual coercion; (3) sufficient economic power in the tying product market; and (4) anticompetitive effects in the tied market.[4]

### A.  Plaintiffs' Allegations In Support Of Their Proposed Product And Geographic Markets Are Incoherent And Contradictory

Plaintiffs have failed to allege that TWC possessed sufficient economic power in "the tying product market" to coerce purchaser acceptance of the tied product.  *Id.*  It is plaintiffs' burden to sufficiently plead a relevant market, which has both product and geographic dimensions.  *Bansavich*, 2008 U.S. Dist. LEXIS 89071, at *7; *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001) (same).  Plaintiffs' allegations in support of their relevant product and geographic market are incoherent and self-contradictory.  This is sufficient, standing alone, to dismiss plaintiffs' complaint.

### 1.  Plaintiffs Have Not Alleged A Relevant Market For "Premium Cable Services"

"Plaintiff must explain why the market it alleges is in fact the relevant, economically significant product market.  If a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand . . . a court may grant a Rule 12(b)(6) motion."  *Re-Alco Indus., Inc. v. Nat'l Ctr. For Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993).  At the motion to

---

[4]    As plaintiffs concede, the dismissal of plaintiffs' federal antitrust claim would necessitate the dismissal of their state antitrust law claims.  (Mar. 9, 2009 Letter from Robert I. Harwood to the Hon. P. Kevin Castel at 5, n.1.)  *See also Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) ("We have noted that the Maine antitrust statutes parallel the Sherman Act, and thus have analyzed claims thereunder according to the doctrines developed in relation to federal law." (internal quotations omitted)); *New York v. Rattenni*, 613 N.E.2d 155, 158 (N.Y. 1993) (holding that New York's Donnelly Act generally has been construed in light of federal antitrust precedent); *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973) ("[T]he body of law applying the Sherman Act, although not binding upon this Court in applying [North Carolina's antitrust law], is nonetheless instructive in determining the full reach of that statute"); W. Va. Code § 47-18-16 (2008) (The West Virginia Antitrust Act statute should be construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes").

dismiss stage, plaintiffs' product market must be at least "plausible."  *E&L Consulting Ltd. v. Doman Indus.*, 360 F. Supp. 2d 465, 473-74, 476 (E.D.N.Y. 2005), *aff'd* 472 F.3d 23, 28 (2d Cir. 2006).

*E&L Consulting*, for example, alleged a "monopoly involving 'a specific natural resource—green hem-firm lumber' and unlawful tying of green hem-fir lumber with market of finished-wood products."  *Id.* at 472.  The court found that the plaintiffs' product market allegations were deficient because they were "contradicted by other facts set forth in [plaintiff's] own complaint."  *Id.*  Plaintiffs' product market allegations here are similarly confusing and contradictory.

Plaintiffs allege that the relevant product market, "Premium Cable Services," is limited to services provided by *cable* multichannel video programming distributors ("MVPDs"), but they do not allege facts that support this definition as plausible.  Plaintiffs admit that basic cable is a separate and different level of service from premium cable (Compl. ¶ 41), but they do not allege facts that would establish that Premium Cable Services is a separate product market.   In particular, plaintiffs fail to allege any facts to show a lack of cross elasticity of demand between Premium Cable Services and basic cable services.  And although plaintiffs allege that "satellite MVPD service is not a suitable direct substitute for cable MVPD" service (*id.* ¶ 74),[5] the complaint says nothing about whether the *premium* video services that satellite companies offer are a "suitable direct substitute" for Premium Cable Services.  Customers have access to the exact same programming on premium channels like HBO and Showtime regardless of whether they subscribe to cable or satellite premium services.

---

[5]     Notably, plaintiffs contend that satellite services are not a substitute for cable services because the high cost of purchasing satellite "equipment" (*i.e.,* set-top boxes) deters switching. (Compl. ¶ 73.)  This contention is fundamentally at odds with their core theory that consumers are harmed by the supposed requirement to lease a cable box.

Even plaintiffs' allegations in support of a cable product market are contradictory. They claim that satellite companies should be excluded from a cable product market, but then rely on government market share statistics that expressly *include* satellite in the relevant product market. (*E.g.*, Compl. ¶ 71 ("A Congressional research report in 2007 found that cable controlled 69% of the nationwide MVPD market, compared to 27.7% for direct satellite transmission.").) These incoherent and contradictory allegations are not sufficient to state a "plausible" product market. *E&L Consulting Ltd.*, 360 F. Supp. 2d at 472.

### 2. Plaintiffs' Allegation Of A Uniform Geographic Market Conflicts With Their Other Allegations That Competition Is Localized

"The geographic market analysis seeks to identify the precise geographic boundaries of effective competition in order to reach a more informed conclusion on potential harm to the market." *Mathias*, 152 F. Supp. 2d at 481. The relevant geographic market should be the "narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market." *Kramer v. The Pollock-Krasner Found.*, 890 F. Supp. 250, 255 (S.D.N.Y. 1995) (quotation omitted). Here, all of plaintiffs' claims must fail because they have not alleged a plausible relevant geographic market or markets.

Although plaintiffs have not identified a specific relevant geographic market, they apparently contend that all of the "communities, or clusters of communities" in which TWC conducts business comprise one uniform geographic market from which the Court could assess TWC's alleged economic power. (Compl. ¶¶ 21-22.) But this contention is not plausible for two independent reasons. First, plaintiffs have not alleged any facts to explain why the geographic market is limited to the communities in which TWC currently competes, instead of some larger area. *Mathias*, 152 F. Supp. 2d at 483 (dismissing complaint, in part, because plaintiffs failed to

11

provide "facts to support the conclusion that the effective area of competition should be drawn so narrowly"). Second, plaintiffs' apparent contention that competition is uniform in these local communities is directly contradicted by numerous allegations in their own complaint.

Plaintiffs expressly allege that the competitive dynamics differ significantly between and among the various communities in which TWC operates. For example, plaintiffs state that TWC competes with "overbuild" cable companies "by lowering prices, not in the entire market, but only in those areas in which the overbuild system actually competes" with TWC. (*Id*. ¶ 76.) Similarly, plaintiffs claim that competition varies depending on whether a cable provider services "several contiguous market areas." (*Id*. ¶ 77.) Plaintiffs further allege that there are areas where "consumers have a choice between two cable services" and that prices are different in those areas. (*Id.* ¶ 74). Plaintiffs also allege that a cable operator's market penetration is different in rural and urban areas. (*Id*. ¶ 71.)

Plaintiffs state time and again that competition varies among the various local markets. Accordingly, there is no basis for their allegation that all of the areas in which TWC provides services comprise one uniform geographic market. Because plaintiffs have not alleged the existence of any plausible geographic market(s), their complaint must be dismissed on that basis alone. *Mathias*, 152 F. Supp. 2d at 483 (dismissing plaintiffs' claims because geographic market allegations were "contradictory" and "there is no clear indication from the complaint as to a precise geographic market").

### B.       Plaintiffs' Factual Allegations Contradict Their Legal Assertion That TWC Possesses Economic Power In A Relevant Market

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works, Inc. v. Independent Ink, Inc*., 547 U.S. 28, 46 (2006). Economic power is "the power to control prices or exclude competition." *United*

*States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  A showing of economic power is necessary for a tying claim because "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1982).  Thus, "[a] failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint."  *Rick-Mik Enters., Inc., v. Equilon Enters. LLC*, 532 F.3d 963, 972 (9th Cir. 2008) (dismissing plaintiffs' tying claim for failure to allege economic power in the market for the purported tying product).

        1.       **Plaintiffs' Own Allegations Contradict Their Claim That TWC's Economic Power Over Cable Services "Naturally" Gives It Economic Power Over Premium Cable Services**

Plaintiffs allege that the "tying product" at issue in this case is "Premium Cable Services" (Compl. ¶ 46) and that TWC has "sufficient economic power in the Premium Cable Services market" to coerce plaintiffs into leasing set-top boxes.  (*Id.* ¶ 103).  However, the complaint contains no facts to support this allegation.  Indeed, the complaint contains only a single sentence purporting to establish TWC's economic power in a putative market for Premium Cable Services:  "In those markets controlled by Time Warner, Time Warner's control over all cable television services *naturally gives Time Warner control over Premium Cable Services*."  (*Id.* ¶ 70 (emphasis added).)  This "naked assertion" is wholly insufficient to demonstrate that TWC has economic power in a purported market for Premium Cable Services.  *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 595 (7th Cir. 2008) (plaintiffs' "naked assertion" that defendant possessed the required economic power for a tying violation was insufficient to state a claim under *Twombly*); *CCBN.com, Inc. v. Thomson Fin. Inc.*, 270 F. Supp. 2d 146, 155-57 (D. Mass.

2003) ("More must be alleged to satisfy the market power element of a section 1 claim than the mere assertion that such power exists.").

Plaintiffs do not explain how having economic power with respect to cable services in general creates economic power with respect to Premium Cable Services.  Indeed, they acknowledge that TWC's subscribers can purchase different "tiers" of services, and that subscribers desiring Premium Cable Services must pay an additional monthly fee.  (Compl. ¶¶ 41-42.)  They further allege that little more than half of TWC's subscribers actually purchase Premium Cable Services.  (*Id.* ¶¶ 91-92.)  Thus, there is no obvious correlation between the purchase of cable services and the purchase of Premium Cable Services, and plaintiffs have no support for their conclusory assertion that alleged market power in cable services "naturally" gives TWC market power over Premium Cable Services.

> **2.    Plaintiffs' Factual Allegations Are Irrelevant And Insufficient To Establish Their Claim That TWC Has Economic Power In A Market For Cable Services**

Even if the Court were to accept the principle that an allegation of economic power in a market for cable services, standing on its own, creates economic power in a "market" for Premium Cable Services, plaintiffs have still failed to allege that TWC has sufficient economic power over cable services.  Plaintiffs' allegations regarding TWC's market power in the market for cable services consist solely of irrelevant and unsupported statements regarding competition and market share among *all* cable providers, *not* TWC individually.

First, plaintiffs fail to estimate TWC's market share nationally or in any of the local geographic areas in which it provides services.  Instead of concentrating on TWC's market share, plaintiffs rely solely on a general allegation that all cable MVPDs, collectively, may have a nationwide market share of almost 70%.  (Compl. ¶ 71.)  This statement says nothing about TWC in particular and is wholly insufficient to allege market share for TWC.  *Sheridan*, 530

F.3d at 594-95 (dismissing plaintiffs' tying claim for failure to plead market power and noting that although "[t]he plaintiffs in drafting their complaint were at least dimly aware that they would have to plead and prove that Marathon had significant unilateral power over the market price of gasoline," they nevertheless "did not provide any nationwide or local statistics for Marathon's market share"); *CCBN.com*, 270 F. Supp. 2d 146 at 155-57 (dismissing monopolization, attempted monopolization and tying claims for failure to allege market share and the existence of any competitors in the market or barriers to entry). Moreover, an aggregated nationwide market share for all cable MVPDs is meaningless in the context of this complaint, where plaintiffs have alleged that competition is different in each of the many, individual geographic markets in which TWC competes. *See* Section I.A.2 *supra*.

Plaintiffs' conclusory allegation that TWC has "*de facto* monopoly power in many areas in which it provides cable television services" because "[c]able MVPDs, including Time Warner, do not normally compete against each other" (Compl. ¶ 69) is likewise insufficient to plead economic power. As with plaintiffs' claim that all cable providers possess 70% market share combined, this allegation is not specific to TWC, but is instead merely a statement about the cable industry generally. Plaintiffs cannot simply state their conclusion that TWC possesses "monopoly" or market power; they must plead facts that would support such allegations. *Sheridan*, 530 F.3d at 595; *CCBN.com, Inc.*, 270 F. Supp. 2d at 155-57.

Plaintiffs' only TWC-specific allegation is that TWC is "the second largest cable MVPD in the United States." (Compl. ¶ 68.) But "[b]eing the 'largest' in a relevant market . . . says nothing of a firm's ability to affect competition in that market." *Dickson v. Microsoft*, 309 F.3d 193, 209 n.20 (4th Cir. 2002) ("Gravity's allegations that Compaq and Dell were the largest PC makers and software distributors provide no basis whatsoever to conclude that either had

sufficient share of the PC market to affect competition in the relevant software markets."); *see also Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc*., 243 F.3d 980, 988 (6th Cir. 2001) ("Ezzo's has merely alleged that Matrix was the biggest company in the industry. . . . Ezzo's did not offer evidence of Matrix's market power").  Thus, alleging that TWC is the *second* largest cable provider plainly does not state market power as a matter of law.

Finally, plaintiffs do not allege sufficient facts regarding barriers to entry or expansion in any relevant product or geographic market.  A court will draw an inference of market power only after fully considering the relationship between market share and other relevant market characteristics, including barriers to entry or expansion.  *Tops Mkts., Inc. v. Quality Mkts., Inc*., 142 F.3d 90, 98 (2d Cir. 1998) (holding that even though defendant possessed more than 70 percent market share, the court could not infer market power because "marketplace realities" such as low barriers to entry showed that defendant did not have market power); *MRO Commc'ns., Inc. v. AT&T Co.*, 1999 U.S. App. LEXIS 32522, at *5 (9th Cir. Dec. 13, 1999) ("Neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent barriers to new entry or expansion").  Plaintiffs fail to satisfy this standard because they allege barriers to entry only with respect to *cable* MVPDs, and they focus primarily on the cost of constructing a parallel cable system from scratch.  (Compl. ¶ 75.)  But plaintiffs concede that "fiber optic" providers, including telephone industry giants Verizon (FiOS) and AT&T (U-Verse), which already have established network infrastructure, *have already entered* and are a "viable threat" to cable companies, including TWC.  (*Id.* ¶ 78.)  Plaintiffs' suggestion that this entry is too recent to matter (*id.*) is baseless.  "[T]he continued entry of competition, albeit with small initial market share . . . indicates that [TWC's] position is subject to significant potential erosion."  *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 114 (3d Cir. 1992).

### C.    Plaintiffs' Own Allegations Confirm That TWC Did Not Coerce Them To Rent Set-Top Boxes As A Matter Of Law

#### 1.    Plaintiffs Admit That TWC Provided CableCARDS As An Alternative To Renting Set-Top Boxes

Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation.  *Unijax v. Champion Int'l, Inc*., 683 F.2d 678, 685 (2d Cir. 1982).  It is black letter law that "[w]here the buyer is free to take either product by itself there is no tying problem."  *Synergetics USA, Inc. v. Alcon Labs., Inc.*, 2009 WL 435299, at *3 (S.D.N.Y. Feb. 23, 2009) (quoting *N. Pac. Ry v. United States*, 356 U.S. 1, 6 n.4 (1958)).  For example, in *Konik v. Champlain Valley Physicians Hospital Medical Center*, the Court of Appeals held that plaintiff had failed to establish her claim that the defendant hospital impermissibly tied use of operating facilities to "preferred" anesthesiology services as a matter of law when the evidence showed that patients could choose other anesthesiologists, not just the "preferred" providers, at the hospital.  733 F.2d 1007, 1017-18 (2d Cir. 1984).  As the hospital allowed patients to utilize operating rooms without using the preferred anesthesiologists, it had not conditioned sale of its operating facilities to use of the preferred anesthesiology services.  *Id*.

Plaintiffs' complaint is devoid of any factual allegations that TWC actually forced them to rent a set-top box.  They have not alleged any of the traditional facts that courts have found to be coercive, such as a contract under which they are obligated to lease set-top boxes.  *Cf. Twombly*, 550 U.S. at 564 n.10 (finding complaint deficient because it failed to allege "specific time, place or person involved" in alleged misconduct).  Instead, plaintiffs summarily allege that TWC tied Premium Cable Services to rental of a set-top box because TWC purportedly barred customers from obtaining set-top boxes from any other source.  (Compl. ¶ 52.)  Not only have plaintiffs failed to allege how TWC purportedly accomplished its coercion, plaintiffs actually admit that they can obtain Premium Cable Services without leasing a set-top box.  Plaintiffs

17

admit that the FCC required cable providers to make CableCARDs, which allow customers to obtain Premium Cable Services without a set-top box, available to their subscribers.  (*Id.* ¶¶ 54-55.)   As in *Konik*, plaintiffs' admission that TWC offers an alternative to set-top boxes necessarily means that TWC did not condition the purchase of its Premium Cable Services on the rental of a set-top box and is fatal to plaintiffs' claim.[6]

Plaintiffs' refusal to pursue claims on behalf of TWC customers who rented a set-top box to receive basic cable services is a concession that they cannot allege a viable claim for tying when a substitute product exists.  (*Id.* ¶ 41.)  As plaintiffs acknowledge, those customers would not have a tying claim because "cable ready" television sets, which can also provide "basic cable" services, are available on the market.  (*Id.*)  For the same reason, because CableCARDs have also been available throughout the class period, customers who rented set-top boxes to procure Premium Cable Services also cannot allege coercion and their tying claim fails.

In an attempt to overcome this fatal flaw, plaintiffs vaguely contend that TWC opposed the FCC's regulation ordering cable operators to provide CableCARDs and was successful in delaying the effective date of some unspecified regulation until July 1, 2007.  (*Id.* ¶ 56.) Although it is unclear precisely what significance plaintiffs ascribe to the July 1, 2007 date, they cannot mean that TWC did not start making CableCARDs available to its customers until July 1, 2007 because that is directly contradicted by the FCC public record, which plaintiffs must know from their required pre-complaint investigation.  *Cf.* Fed. R. Civ. P. 11(b)(3).

Instead, plaintiffs are presumably referring to the fact that cable providers were not required to comply with a particular aspect of the FCC's CableCARD regulations until July 1,

---

[6]     It is also true that some consumers who choose not to purchase Premium Cable Services lease a set-top box even though they have a "cable ready" television set, because, for example, they want to have digital video recording capability.

2007.  (Compl. ¶ 56.)  July 1, 2007 was the date by which cable companies had to stop leasing devices that integrated navigation and security functions.  *Navigation Devices Order*, 13 FCC Rcd at 14793 ¶ 49; 47 C.F.R. § 76.1204(a).  But by July 2007, TWC and other cable companies had been supporting CableCARD devices and making CableCARDs available to their customers for nearly three years.  The FCC ordered cable operators to begin providing CableCARDs by July 2004 and they did so.  *Plug and Play Order*, 18 FCC Rcd at 20894 ¶ 19; FCC Eleventh Annual Rpt., 20 FCC Rcd at 2852 ¶ 187 ("As of August 2004, the top 10 cable operators had deployed CableCARDs to the approximately 5,000 subscribers nationwide that have thus far requested them.  The cable industry indicates that it has begun to educate consumers about the retail availability of CableCARDs and unidirectional digital cable products by working with local retailers and training their customer service representatives, and by providing consumers with educational material directly via websites, monthly bills, brochures, and advertisements."); *see also supra* n.3.

### 2.   TWC's Alleged Promotion Of Set-Top Boxes Over CableCARDs Cannot Establish Coercion As A Matter Of Law

Plaintiffs further attempt to salvage their coercion claim by alleging that TWC (1) does not provide information to plaintiffs regarding CableCARD technology, (2) states that there are limitations to a CableCARD connection and (3) "promotes" set-top boxes over CableCARDs. (Compl. ¶ 60.)  These allegations are insufficient as a matter of law.  "A manufacturer's use of strong persuasion, encouragement, or cajolery to the point of obnoxiousness . . . does not, however, amount to actual coercion.  Actual coercion supporting a finding of a tying violation is present only if the manufacturer goes beyond persuasion and ***conditions*** its retailer's purchase of one product on the purchase of another product."  *Unijax*, 683 F.2d at 685 (internal citations and quotations omitted); *see also Trans Sport, Inc. v. Starter Sportswear, Inc*., 964 F.2d 186, 192 (2d

Cir. 1992) (same).  At most, plaintiffs allege that TWC recommends that customers rent a set-top box instead of a CableCARD.  But the Second Circuit has recognized that a manufacturer's recommendation of a product is not the degree of coercion necessary to establish a tying arrangement.  *Gen. Motors Corp. v. Gibson Chem. & Oil Co.*, 786 F.2d 105, 110 (2d Cir. 1986). As TWC did not condition purchase of Premium Cable Services on the rental of a set-top box, plaintiffs' complaints that TWC promoted set-top boxes as a superior product cannot constitute an allegation of actual coercion.

### 3. Plaintiffs' Allegations Regarding TWC's Purported Violations Of FCC Regulations Do Not Establish Coercion

In a final effort to show coercion, plaintiffs allege that TWC violated (or attempted to violate) FCC regulations concerning navigation devices.  These claims are also insufficient as a matter of law.  For example, plaintiffs allege that TWC first opposed and then sought to delay the FCC's proposed rules requiring the development of CableCARD technology, and that TWC "engaged in practices to prevent the CableCARD from becoming an effective option for consumers."  (Compl. ¶¶ 56, 59.)  Furthermore, plaintiffs allege that TWC has violated the FCC's regulatory framework by "continu[ing] to limit the employment of [CableCARD] technology."  (*Id.* ¶ 63.)

Even if TWC had clearly violated the FCC's rules implementing Section 629 (and it did not), such regulatory violations cannot form the basis for antitrust liability.  As the Supreme Court made clear in *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), the Communications Act "does not create new claims that go beyond existing antitrust standards."  *Id.* at 407.  In *Trinko*, plaintiffs alleged that a telecommunications carrier breached its duty under the Communications Act to share certain portions of its network with competitors, and asserted that the failure to comply with Communications Act obligations

amounted to a violation of Section 2 of the Sherman Act.  The Court disagreed.  It held that the defendant would have no duty to share its network in the absence of statutory obligations imposed by the Communications Act, and concluded that such a regulatory duty cannot form the basis for antitrust liability.  *Id.* at 412.

Just as in *Trinko*, the absence of any *antitrust* duty, as opposed to a *regulatory* duty, to assist in the development of competitive markets dooms plaintiffs' claims.  In the absence of FCC regulations concerning the creation, deployment, and support of CableCARDs, TWC would have no obligation to promote such technology or any alternative means of fostering commercial availability of navigation devices.  *See id.* at 410.  Thus, plaintiffs' allegations that TWC violated FCC regulations cannot support their allegations of coercion.

### D.    Plaintiffs' Allegations Confirm That There Were No Anticompetitive Effects In The Market For Set-Top Boxes At The Operative Time

Plaintiffs' claims also fail because plaintiffs do not allege any anticompetitive effects in the set-top box market unrelated to the introduction of CableCARDs, which was done pursuant to the regulations and timetable that the FCC mandated.  *E&L Consulting*, 472 F.3d at 31 (plaintiffs must allege "anticompetitive effects in the tied market").  To establish an effect on competition in the market for set-top boxes, plaintiffs, at a minimum, must be able to allege that some "willing and able seller" of set-top boxes "was foreclosed from selling to consumers by the alleged tie."  *Cancall PCS, LLC v. Omnipoint Corp.*, 2001 WL 293981, at *5 (S.D.N.Y. 2001).

In *Cancall*, for example, the defendant operated a prepaid wireless network and sold handsets and SIM chips to distributors, to be resold to end customers.  2001 WL 293981, at *2.  The plaintiff wanted to buy only the SIM chips and not the telephone handsets.  *Id.*  When the defendant refused, the plaintiff sued, alleging that the defendant was illegally tying the sale of network air time to the purchase of telephone handsets.  *Id.*, at *4.  The court dismissed the claim

because it was undisputed that the defendant was the only seller of the handsets. *Id.*, at *5. Thus, even if the defendant had market power in the market for network air time, it was not using that power to restrain competition in the handset market. *Id.* "[T]he alleged tie did not foreclose any handset sales by any other entity" because there was no other "willing and able seller of handsets." *Id.*, at *4, *5. *See also Coniglio v. Highwood Servs.*, *Inc.*, 495 F.2d 1286, 1291 (2d Cir. 1974) (no tying violation where at the time the complaint was filed "there were neither actual nor potential competitors" to the seller in the tied product market).

As in *Cancall*, plaintiffs here fail to allege that, prior to the time cable operators developed and implemented CableCARD technology, there was any willing and able seller of set-top boxes that was foreclosed from selling to TWC customers. Before the FCC adopted the CableCARD regulatory scheme, neither TWC nor any other cable provider had a duty to create or promote a retail market in which third parties could sell navigation devices. Plaintiffs state that consumer electronics manufacturers were not "willing to commit their resources" to developing set-top boxes or other navigation devices prior to the FCC's CableCARD regulations. (Compl. ¶ 88). Thus, plaintiffs admit that there were not even any potential sellers, much less the required "willing and able" sellers.

The only purported market foreclosure that plaintiffs allege is that in December 2006 some manufacturers were frustrated by the fact that the cable providers had allegedly delayed the implementation of CableCARDs. (*Id.* ¶ 59.) Even if true, this allegation has nothing to do with whether any manufacturer was foreclosed from entering the set-top box market by the alleged tie. TWC had an obligation to comply with the regulations and timetable that the FCC adopted. Whatever concerns manufacturers had about TWC's compliance with that timetable they properly addressed to the FCC. (*See id.*)

## II.   PLAINTIFFS CANNOT STATE A CLAIM UNDER STATE CONSUMER PROTECTION STATUTES AS A MATTER OF LAW

### A.   Plaintiffs' Claims Under The Consumer Protection Laws of California, Kansas, Missouri And New Jersey Fail Because They Are Based Solely On Legitimate Business Conduct That Does Not Violate The Antitrust Laws

It is well-accepted that "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).  *See also Korea Kumho Petrochemical v. Flexsys Am. LP*, 2007 U.S. Dist. LEXIS 61373, at *17 (N.D. Cal. Aug. 4, 2007) (same).  Plaintiffs have not advanced any theory of recovery other than TWC's alleged antitrust violations, and plaintiffs have failed to allege facts sufficient to state a claim for such violations.  TWC's legitimate business conduct is not unfair to consumers and therefore does not violate the consumer protection laws of California, Kansas, Missouri or New Jersey.

### B.   Plaintiffs' Claims Under The Consumer Protection Statutes Of New Jersey And Kansas Also Fail Because Plaintiffs Do Not Allege Unconscionable Or Deceptive Practices

Plaintiffs' claims under the Kansas Consumer Protection Act ("KCPA") and New Jersey Consumer Fraud Act ("NJCFA") separately fail because plaintiffs do not allege that TWC engaged in deceptive acts or practices or unconscionable conduct as required by those statutes. Kan. Stat. Ann. §§ 50-626(a), 50-627(a); N.J. Stat. Ann. § 56:8-2.

First, plaintiffs do not allege that TWC's purported conduct is "deceptive" as required under the KCPA and NJCFA.  The allegation in the complaint with respect to the KCPA merely quotes certain provisions of the statute.  (Compl. ¶¶ 109-17.)  Similarly, plaintiffs' bare allegations fail to allege deception under the NJCFA.  That portion of the complaint alleges

deception only "to the extent" that any misrepresentations or failures to inform occurred. (Compl. ¶ 158.)  As plaintiffs fail to allege that any such misrepresentations actually occurred, much less that they were made to a New Jersey consumer in particular, these allegations fail to state a claim.

Plaintiffs' allegations also do not constitute "unconscionable" conduct under the KCPA and NJCFA.  Unconscionable conduct includes: 1) taking advantage of a consumer's ignorance; 2) charging a price that "grossly exceeded" the price of similar property that is readily available; and 3) inducing a consumer to enter into an "excessively one-sided" transaction.  Kan. Stat. Ann. § 50-627; *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) ("'Unconscionable' [conduct] implies [a] lack of good faith, honesty in fact and observance of fair dealing.") (quotation and citation omitted)).  Plaintiffs do not plead any facts to support their general allegation that TWC's purported antitrust violation was an "unconscionable practice."  Plaintiffs do not allege inequitable bargaining power between them and defendants.  Nor do plaintiffs allege a "gross disparity" between the FCC regulated equipment rates that TWC charges for set-top boxes (47 C.F.R. § 76.923(a)(2)) and the value they received; plaintiffs fail to allege the prices they paid for either Premium Cable Services or the lease of the set-top box, or what value they received from those products.  The alleged anticompetitive conduct that plaintiffs allege is "not the kind of conduct prohibited under" the KCPA and other statutes that prohibit unconscionable conduct.  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007).

**CONCLUSION**

For all the reasons stated above, TWC respectfully requests that the Court dismiss plaintiffs' complaint in its entirety, with prejudice.


Dated: May 12, 2009               Respectfully submitted,
      Washington, D.C.

                                       /s/ Margaret M. Zwisler
                                       Margaret M. Zwisler (*pro hac vice*)
                                       Matthew A. Brill (*pro hac vice*)
                                       Jennifer L. Giordano (JH-5052)
                                       555 Eleventh Street, N.W., Suite 1000
                                       Washington, D.C. 20004
                                       Tel: (202) 627-2200
                                       Fax: (202) 627-2201
                                       margaret.zwisler@lw.com
                                       jennifer.giordano@lw.com

                                       *Counsel for Defendant Time Warner Cable Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that copies of the foregoing Defendants'
Memorandum Of Law In Support Of Motion To Dismiss Plaintiffs' First Amended Consolidated
Class Action Complaint were served on May 12, 2009 via the CM/ECF system to counsel of
record, and also via overnight mail to the following:

John F. Edgar
Edgar Law Firm, LLC
1032 Pennsylvania Avenue
Kansas City, MO 64105

<u>/s/ Jennifer L. Giordano</u>
Jennifer L. Giordano (JH5052)